Filed 2/3/25  P. v. Gutierrez CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>          v.<br><br>DANIEL GUTIERREZ,<br><br>     Defendant and Appellant. | F084644<br><br>(Madera Super. Ct. No. MCR055290)<br><br>**ORDER MODIFYING OPINION**<br>**[NO CHANGE IN JUDGMENT]** |

It is hereby ordered that the opinion filed herein on January 21, 2025, be modified as follows:

1.  On page 32, the first sentence on the page, change the name "Martinez" to the name "Gutierrez."  So the sentence reads:

    Gutierrez responded, "not exactly."

2.  On page 34, the first sentence of the third full paragraph under *2. The Objective Element: Evidence of Sufficient Provocation*, change the word "subject" to "subjective."  So the sentence reads:

    Even assuming the trial evidence was sufficient to establish the subjective element of the heat of passion theory, we further conclude that there is insufficient evidence to support the objective component of heat of this theory.

Except for the modification set forth, the opinion previously filed remains unchanged.

This modification does not effect a change in the judgment.

SMITH, J.

WE CONCUR:


DETJEN, Acting P. J.


SNAUFFER, J.

Filed 1/21/25  P. v. Gutierrez CA5 (unmodified opinion)

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>DANIEL GUTIERREZ,<br><br>Defendant and Appellant. | F084644<br><br>(Super. Ct. No. MCR055290)<br><br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Madera County.  Dale J. Blea, Judge.

Valerie G. Wass, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Louis M. Vasquez and Lewis A. Martinez, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

# INTRODUCTION

Appellant Daniel Gutierrez was convicted of second degree murder (Pen. Code,[1] § 187, subd. (a), count 1) and two counts of possession of a firearm by a felon (§ 29800, subd. (a)(1), counts 2 & 3). In addition, the jury found true enhancements for the use of a firearm in the commission of the murder. (§§ 12022.53, subd. (a)(1), (b), (c), & (d), 12022.5, subd. (a)(1).) The trial court sentenced Gutierrez to an indeterminate prison term of 40 years to life plus a determinate term of three years.

Gutierrez raises multiple claims on appeal. First, he contends that the trial court erred by excluding evidence of prior violent acts committed by Scott Martinez, the murder victim, against a woman with whom Martinez was in a dating relationship. Second, the trial court erred in denying two of his motions for a mistrial. Third, the trial court failed to instruct the jury on heat of passion voluntary manslaughter, sua sponte. Fourth, Gutierrez contends that the cumulative effect of these errors necessitates reversal of his conviction. Finally, Gutierrez contends that the trial court abused its discretion by declining to strike the firearm use enhancements applied to his murder conviction. We affirm.

# FACTUAL AND PROCEDURAL HISTORY

On April 11, 2022, the Madera County District Attorney filed a first amended information charging Gutierrez with first degree murder (§ 187, subd. (a)) and two counts of possession of a firearm by a felon (§ 29800, subd. (a)(1)). As to count 1, the information further alleged firearm use enhancements (§ 12022.5, subd. (a)(1), 12022.53, subds. (b), (c), (d)). In addition, the information alleged the presence of numerous aggravating factors. (See Cal. Rules of Court, rules 4.421(a)(1)-(3), (a)(8), (b)(1)-(2).)

On April 26, 2022, a jury was empaneled.

---

[1] All undefined statutory citations are to the Penal Code unless otherwise indicated.

On May 18, 2022, the jury began deliberations. That afternoon, the jury found Gutierrez guilty of second degree murder, two counts of possession of a firearm by a felon, and found true firearm use enhancement allegations. In a bifurcated proceeding, the jury found true the presence of aggravating factors.

On July 8, 2022, the trial court sentenced Gutierrez to an indeterminate term of 40 years to life plus a determinate term of three years.

A timely notice of appeal followed.

**The Prosecution's Case**

Just after 4:00 a.m. on December 14, 2016, R.O. was driving near the intersection of 4th Street and H Street in Madera when he observed a black Honda Civic stalled on the road. The Honda, which was a primered black, had passed R.O. just minutes before when R.O. was stopped at a nearby bank.

When R.O. stopped his vehicle to investigate, he found that the passenger's side window had a bullet hole in it and the window was shattered. The Honda's engine was still running and loud music was playing from the inside. The driver, Scott Martinez, had been shot. He was holding his neck and was slumped over in the driver's seat. R.O. called 911.

Martinez was unresponsive but alive. He had suffered a gunshot wound to the right portion of his head. Martinez was transported to the hospital. He succumbed to his injury four days later.

### 1. Police Investigation

Madera Police Detective Matt Sauceda testified at Gutierrez's preliminary hearing. His testimony was read into the record due to his unavailability to testify at Gutierrez's trial.

Detective Sauceda performed a bullet trajectory analysis at the crime scene. He estimated that the bullet that had killed Martinez was fired from approximately 15 feet away.

Detective Sauceda gathered surveillance videos depicting the area surrounding 4th Street and H Street, where the shooting occurred. The videos depicted Martinez visiting a nearby AMPM market, adjacent to an Arco gas station at approximately 3:47 a.m., just prior to the shooting. His black primered Honda was parked outside of the store, next to a silver Dodge Charger. At various points, Martinez spoke to the driver of the Dodge Charger and went in and out of the AMPM.

A light-colored SUV pulled up to a nearby gas pump and parked. Two minutes later, the driver of the SUV, a male dressed in dark clothing, entered the AMPM market. The man repeatedly looked in Martinez's direction as Martinez stood near his vehicle, searching or working on something inside of his vehicle. Martinez reentered the AMPM and stood in line directly behind the driver of the SUV as the man made a purchase.

At approximately 3:54 a.m., Martinez took the west exit out of the gas station and drove north on Gateway Drive. Seconds later, the light-colored SUV drove away, following the same pathway as Martinez. Surveillance videos from several nearby businesses and an automatic teller machine depicted the SUV continue to follow Martinez. None of the surveillance videos depicted the subsequent shooting.

The light-colored vehicle appeared to be a model 1997 to 2003 Lexus RX 300 SUV. Detective Nicolas Webster and Officer Heath Middleton from the Madera Police Department contacted the Department of Motor Vehicles to obtain a list of the registered owners in Madera County for the make and model of the vehicle that appeared to have followed Martinez. Gutierrez was listed as the registered owner of a 2003 Lexus RX 300. His photograph also looked similar to one of the men that had entered the AMPM market that Martinez had visited shortly before the shooting.

### 2. *Gutierrez's Arrest/Police Interrogation*

On December 15, 2016, Gutierrez was arrested outside of his home. He had a .22-caliber handgun concealed in a back brace that he was wearing, and a .357-caliber revolver between the center console and the driver's seat of his vehicle.

4.

Following Gutierrez's arrest, Detectives Shant Sheklanian and Hector Garibay questioned Gutierrez at the Madera Police Department. Gutierrez claimed that he had just acquired the guns the day before his arrest. According to Gutierrez, his ex-girlfriend and "her dudes" came by his home frequently, followed him to work, and had pulled out guns on him. He was scared.

Gutierrez initially denied being in possession of the guns found inside his vehicle while he was at the AMPM market. He also claimed that he slowed down at the traffic light on 4th and H Street but that he did not stop at the stoplight. Gutierrez further denied that Martinez had threatened or pointed a weapon at him.

When detectives pressed Gutierrez further, he eventually admitted that he had fired a gun, but claimed that it was an accident. Detectives showed Gutierrez surveillance videos from the AMPM market, which depicted Gutierrez driving aggressively behind Martinez. Gutierrez claimed that he was just "[t]ryn' to scare [Martinez]." However, he eventually admitted that he was angry. He wanted to let Martinez know that he was not "[the] one to play with."

Gutierrez told the detectives that he had pulled out a revolver as he approached the stoplight. He challenged Martinez to fight. When Martinez replied, "[L]et's go," Gutierrez began pulling his gun back inside his vehicle, preparing to fight Martinez. The gun accidentally discharged.

At the conclusion of the interrogation, Gutierrez wrote a letter of apology to Martinez's family. He claimed that the shooting "was an accident that was not [his] intention at all."

### 3. The Cell Phone Data

Text messages extracted from Gutierrez's phone revealed that at 7:12 a.m. on the morning of the shooting, an outgoing message sent from Gutierrez's phone stated, "Sorry to hit you up this early. Just wanted to ask if you seen the cops show up to my house this morning?" Another outgoing message stated, "Hey, look up the Madera news. I don't

have to tell you, but I will look it up.  It happened on 4th Street.  I had to.  U understand carnal."

The data extracted from Gutierrez's phone also showed that a link to a news story had been accessed on December 14, 2016, just after 12:00 p.m.  The news article was about the shooting.

### 4.  The Autopsy

On December 22, 2016, Dr. Mark Super, a forensic pathologist, performed an autopsy on Martinez.  Dr. Super opined that Martinez had died from a gunshot wound to the right side of his head.  The gunshot caused a " 'keyhole' " injury to Martinez's head.  Dr. Super explained that the bullet struck at an angle that had nearly missed Martinez, creating a hole with characteristics of both an entrance and an exit wound.  The bullet entered the right side of Martinez's head and traveled in a straight line.

### 5.  Gutierrez's Letter to Kyle Cevasco

On October 5, 2017, while Gutierrez was in custody, he wrote a letter to an acquaintance, Kyle Cevasco, an inmate.  The letter explained that on the morning of the shooting, Gutierrez had to be at work at 2:30 a.m.  When he returned home, 10 undercover police cars and five police cars pulled up and he was confronted by armed police officers.  The letter stated:

> " 'Well, I had the .357 laying on the center console, and I had that piece of shit .22 on my back in my back brace.  LOL.  They took me in and took my Lexus away to use it as evidence.
>
> " 'You asked if he floor sure grounded???[2]  Yup.  He died 3 days later.  One shot to his dome from 15 feet away!!!  LMFAO.  Well, he's 1 of the 3 [people] I had problems wit!!!  It's okay.  Ill handle the other [ones] when I gets out of this place sum time!!!  True fact."

---

[2]  Gutierrez also used the word "floor" interchangeably with the word "for" throughout text messages not recited in this statement of facts.

The letter ended with the following statement: "Well, Ill end this one now. Until pen meet paper again my Boyy!!! That one and only lonely one shot Listo Gutierrez." The word "Listo" is tattooed across Gutierrez's abdomen.

***The Defense's Case***

### 1. Gutierrez's Trial Testimony

Gutierrez testified that Martinez had threatened him, shot at him, and physically assaulted him on multiple occasions. He explained that these events transpired because Gutierrez had previously dated a woman, Rosa, with whom Martinez subsequently became involved, implying that Martinez was jealous of the relationship.

Five to eight months prior to the murder, Martinez approached Gutierrez at a gas station and told him that "he wanted to kill [him] and shoot [him]." Gutierrez laughed because he did not know who Martinez was. However, when he saw Martinez's face, he felt threatened, believing Martinez "was on something."

As Gutierrez attempted to open the door to his vehicle, Martinez slammed it shut, stating, " 'I want to shoot you right now.' " Gutierrez challenged Martinez, " 'Why don't you do it, then?' " Martinez replied, " 'There's cameras here. Go somewhere else.' " Gutierrez fled in his vehicle when he observed Martinez reaching for something in his vehicle. Martinez then followed Gutierrez for approximately two or three blocks.

Two weeks after this confrontation, Gutierrez was walking back from his father's home at approximately 3:30 a.m. when three vehicles surrounded him. He saw one of the vehicles signal another by flashing its headlights. Gutierrez recognized the first vehicle as the vehicle that Martinez was driving when Martinez had previously threatened him. Six men, including Martinez, got out of the vehicles. Martinez directed the men to " 'Get him.' " The men began running towards Gutierrez. Before he could flee, the men, now seven in total, began to physically beat Gutierrez, hitting him with brass knuckles and bats. Gutierrez claimed he lost two teeth because of the attack.

Gutierrez stated that following the incident in which he was "jumped" he would frequently see Martinez drive by his home, looking at Gutierrez as he passed. He also observed other individuals drive by his home in Martinez's vehicle or in a silver Dodge Charger with rims. Gutierrez put up cameras around his house so that he could monitor these individuals.

Gutierrez added that he had been jumped "many times" while walking home from his father's house and that Martinez had previously shot at him on the freeway on two separate occasions. Gutierrez further stated that when he would come outside of his home early in the morning, he would often see Martinez's primered car parked outside, or the silver Dodge Charger, which he recognized by its rims. He claimed that Martinez and his friends began following him to work. Gutierrez believed that Martinez was trying to kill him.

Gutierrez claimed that he had never threatened Martinez, initiated physical contact with him, or tried to provoke him. He had only ever defended himself.

When Gutierrez saw Martinez and the silver Dodge Charger at the AMPM on December 14, 2016, he became scared and paranoid. According to Gutierrez, Martinez was "mad dogging [him]," and exclaimed, " 'There he is' " when he saw Gutierrez. Gutierrez became afraid that Martinez was going to pull something out of his vehicle.

After Gutierrez purchased some cigarettes from inside the AMPM market, he returned to his vehicle and spoke with his boss on the phone. He began driving to work, coincidentally following the same route as Martinez.

As he approached a red light at the intersection of 4th and H Street, where Martinez was waiting in the lefthand turn lane, Gutierrez pulled out a loaded, half-cocked .357-caliber revolver, which he had obtained the night before. Gutierrez pulled into the right lane, parallel to Martinez. He pointed his revolver toward the street so that Martinez could see it.

8.

Martinez's window was rolled up, but Gutierrez could clearly hear Martinez yelling at him and threatening him in Spanish. As Martinez was "running his mouth," Gutierrez saw Martinez reaching for something. Gutierrez believed that Martinez may have been searching for a gun. Gutierrez felt as if he was in immediate danger. He kept his revolver rested on the windowsill of his vehicle. He stated that his whole body was shaking because he had pulled a gun out on Martinez. He felt like he was "not exactly" in control of his emotions.

Martinez and Gutierrez were yelling back and forth. At some point, Martinez asked Gutierrez, " 'What the eff are you going to do with that?' " referring to Gutierrez's revolver. Gutierrez challenged Martinez to fight. Martinez stated, " 'Wait till my –my boy comes around, and you'll see …what's going to happen.' "

Gutierrez looked in his rearview mirror to see if someone was approaching from behind him. As he did, his revolver began to fall off the windowsill. Gutierrez grabbed onto the revolver, which caused it to discharge.

Gutierrez saw the bullet hit Martinez's vehicle, heard Martinez yell, and observed him throw his hands up. He then heard the volume of Martinez's music increase. Gutierrez turned right, entered the freeway, and drove to work, where he worked a seven-hour shift. He later learned that he had shot Martinez, which was never his intention.

During cross-examination, Gutierrez admitted that if he had turned right while stopped at the intersection, he would have traveled to the freeway.

### 2. *The Testimony of D.G.*

A few days prior to the shooting, Gutierrez received a phone call as he and D.G. were having dinner. Gutierrez picked up the call and put the phone on speaker. D.G. heard individuals on the other end of the phone say, "I'm going to kill you." Gutierrez told D.G. that it was the people who had been harassing him. When Gutierrez and D.G. looked outside, they saw a vehicle drive away.

9.

D.G. had also observed Gutierrez walking with a cane "some days" before the shooting, which Gutierrez attributed to arthritis. He further observed that the back window on Gutierrez's vehicle had been broken, but D.G. did not specify when his observation occurred.

On another unspecified occasion, D.G. had heard Gutierrez mention that vehicles were following him, but he had only heard Gutierrez mention this happening once. D.G. had never personally observed this occur. Gutierrez told D.G. that he had put up with so much and that he could not do it anymore.

With respect to Gutierrez's injuries from the prior assaults he had described, D.G. corroborated that Gutierrez had been complaining about foot pain. Gutierrez told D.G. that his injury was the result of being attacked by various individuals. However, Gutierrez never mentioned Martinez's name specifically.

D.G. had heard of Gutierrez's ex-girlfriend "Rosa," and claimed that he had personally observed Gutierrez with Rosa. But this was approximately six or seven years ago.

## DISCUSSION

I. **The Trial Court's Denial of Gutierrez's Motion to Introduce Evidence of Martinez's Prior Acts of Violence**

Gutierrez contends that the trial court erred by denying his motion to introduce evidence of prior bad acts by Martinez. The trial court excluded this evidence under Evidence Code section 352. We conclude that Gutierrez has failed to demonstrate prejudicial error by the trial court's exclusion of this evidence.

### A. *Background*

#### 1. *The Evidence Code Section 1103 Evidence*

Prior to trial, counsel sought to admit evidence of seven different incidents Martinez had perpetrated against M.A., a woman with whom he had been in a dating relationship. Trial counsel argued that evidence of these acts was admissible under

10.

subdivision (a) of Evidence Code section 1103. According to trial counsel, these incidents would be relevant to show that Martinez had a violent character, and was therefore, likely the initial aggressor during the stoplight confrontation.

### a. Harassing Phone Calls to M.A. (August 24, 2016)

M.A. had a restraining order against Martinez which allowed for peaceful contact. M.A. reported that Martinez was violating the order by continuously calling and text messaging her after she had asked him not to contact her. M.A. also felt that she was being stalked by Martinez, who had left notes on her vehicle and had visited her workplace. While Madera Police Officer Jose Hernandez was interviewing M.A., she received a text message from Martinez. The content of the message demonstrated that Martinez was aware that Officer Hernandez was speaking to M.A.

### b. Theft of M.A.'s Vehicle (August 18, 2016)

After Martinez visited M.A., she discovered that the key to one of her vehicles was missing. When she called Martinez, Martinez admitted that he had taken the vehicle and claimed that he would return it later. Later in the day, when the vehicle had still not been returned, M.A. attempted to call Martinez several more times. When Martinez would not answer her phone calls, M.A. reported the vehicle stolen to police.

### c. Domestic Violence Incident Against M.A. (March 19, 2016)

M.A. locked her keys inside her vehicle when she was out with Martinez. Martinez became angry and began yelling at her in front of bystanders. Later, when they returned home, Martinez slept for a couple of hours. When M.A. woke him, Martinez began yelling at her and shoved her against the wall. He put his hand on her chest and pushed her against the refrigerator as he yelled at her. Martinez then chased M.A. with a broomstick. When responding officers subsequently contacted and arrested Martinez, they found methamphetamine on him.

11.

#### d. *Domestic Violence Incident Against M.A. (January 28, 2015)*

After M.A. woke Martinez, he became angry with her and verbally and physically abused her. M.A. managed to run away from Martinez and called the police. When Martinez realized that M.A. had called the police, he told her, " 'your gonna get it..watch, when I get out your gonna get it...' " As Martinez fled the residence, he approached M.A.'s mother's vehicle, and jumped on the hood, denting it. As responding officers obtained M.A.'s statement, Martinez texted her " 'ur a piece of shit ur no good just kill ur self,' " and " 'ur done bro.' "

#### e. *Domestic Violence Incident Against M.A. (October 20, 2014)*

Martinez became angry when he could not find his glasses. He yelled at M.A., slapped her with his open hand, and told her " 'Bitch, go to the room now and find my glasses.' " Martinez also slapped their two-year-old child. After M.A. told Martinez to leave the child alone, he threw a kiwi and a basket at M.A.

M.A. found a small piece of plastic inside of Martinez's jacket. Responding officers believed that the substance inside contained methamphetamine.

#### f. *Domestic Violence Incident Against M.A. (June 11, 2013)*

During an argument, Martinez struck M.A. with a closed fist as she was holding their one-year-old child. When responding officers arrived at the couple's apartment, Martinez was standing outside with his personal effects. Inside of one of those boxes was a 12-gauge shotgun.

#### g. *Domestic Violence Incident Against M.A. (December 20, 2012)*

During an argument, Martinez called M.A. a " 'fat fucking bitch' " and punched her twice in her abdomen, causing M.A. so much pain that she went to the emergency room.

### 2. *The Trial Court's Ruling*

Prior to trial counsel's opening statements, counsel requested clarification from the court concerning what comments could be made during opening statements about the

Evidence Code section 1103 evidence. The trial court explained that counsel could not bring in evidence concerning Martinez's bad character unless counsel clarified what the defense would be, and whether the evidence presented would support a claim of self-defense. The court declined to allow trial counsel to make comments about Martinez's bad character or his propensity for violence during opening statements.

During the prosecutor's case-in-chief, the admissibility of Martinez's prior bad acts came up again. The trial court stated that there had been no evidence showing that Martinez had presented an immediate threat to Gutierrez, or that Gutierrez had acted in response to a threat. Consequently, trial counsel had not yet established the admissibility of Martinez's prior acts.

Gutierrez testified in his defense. Following the prosecutor's cross-examination of Gutierrez, the parties discussed the Evidence Code section 1103 evidence. The trial court remarked that even if the requisite threshold findings had been met for the admission of M.A.'s testimony concerning Martinez's prior bad acts, there were still Evidence Code section 352 issues.

Following Gutierrez's testimony, the trial court concluded that evidence of Martinez's prior acts was inadmissible, explaining that Martinez's version of events was inconsistent with a claim of self-defense. The court explained:

> "There's no evidence that is credible, and I have to judge credibility for the purposes of—of allowing … the 1103 evidence in or not. I just don't find that there's any credible evidence that supports a theory that Mr. Gutierrez had a reasonable belief that he was in imminent danger of being killed or suffering great bodily injury. If he had that belief—he knew that Mr. Martinez had fired weapons at him from his car in the past, not on one, but two occasions. It would—it's just [i]nconceivable that he would pull up alongside of that vehicle and expose himself to being shot by Mr. Martinez, and, ultimately, there were no firearms found in Mr. Martinez's vehicle.

> "Where there is no evidence presented that a victim posed a threat to the defendant, it's proper to exclude evidence related to the victim's

propensity for violence. I—I'm not going to allow that propensity evidence. I'm not going to allow 1103 evidence under the facts of this case, based on the evidence that has opinion [*sic*] presented in the trial up to this point. I—I don't find that to the—to the extent that it's relevant, 352—there's an undue risk confusing the jury and confusing issues in this case, so I'm—I'm not going to allow the 1103 evidence.

"And—and I have serious concerns as to whether self-defense is really a viable defense in this case. Accident? Certainly. I think there's—there's sufficient evidence to—to instruct on—on accident, but—and I'm not ruling on this yet, but—but I'm concerned about—about a self-defense under the facts that have been presented."

Subsequently, during the parties' discussion of the jury instructions, the trial court explained that its ruling was not inconsistent with the fact that the jury was being instructed on self-defense (CALCRIM No. 505 Justifiable Homicide: Self-Defense or Defense of Another). The trial court clarified that it had ruled evidence of Martinez's prior bad acts were inadmissible under Evidence Code section 352, finding the probative value of the evidence was substantially outweighed by the danger of misleading the jurors, confusing the issues, and the risk of undue prejudice. With respect to the evidence of self-defense and whether the self-defense instruction was warranted, the court explained that it was for the jury, not the court, to decide whether Gutierrez was defending himself or not.

The jury was ultimately instructed, in relevant part, on self-defense (CALCRIM No. 505); voluntary manslaughter: imperfect self-defense (CALCRIM No. 571); excusable homicide resulting from an accidental killing (CALCRIM No. 510); provocation and its effect on degree of murder (CALCRIM No. 522); and involuntary manslaughter (CALCRIM No. 580).

Prior to closing argument, trial counsel raised the Evidence Code section 1103 evidence issue again. The trial court reiterated that its decision to exclude evidence of Martinez's prior acts was based upon Evidence Code section 352, finding the probative

14.

value of this evidence was only slight compared to the danger of misleading the jury, confusing the issues, and undue prejudice.

### B. Legal Principles

Subject to certain exceptions, character evidence is inadmissible to prove a person's conduct on a specified occasion. (See Evid. Code, § 1101, subd. (a).) One exception to this prohibition is "the violent victim rule." (*People v. DelRio* (2020) 54 Cal.App.5th 47, 54 (*DelRio*), citing Evid. Code, § 1103, subd. (a)(1).)

Evidence Code section 1103, subdivision (a) provides the following in part: "In a criminal action, evidence of the character or a trait of character (in the form of an opinion, evidence of reputation, or evidence of specific instances of conduct) of the victim of the crime for which the defendant is being prosecuted is not made inadmissible by [Evidence Code s]ection 1101 if the evidence is: [¶] (1) Offered by the defendant to prove conduct of the victim in conformity with the character or trait of character."

Thus, evidence that a victim had previously threatened or harmed others is not necessarily prohibited by Evidence Code section 1101, subdivision (a). Indeed, such evidence may be admissible in two ways. First, if the defendant is claiming self-defense and the defendant knew of the victim's prior threatening and/or harmful conduct, then such evidence could be relevant to the defendant's belief that self-defense was necessary. (See *People v. Tafoya* (2007) 42 Cal.4th 147, 165-166.) However, to be admissible on this basis, the defendant must have known of the victim's reputation for dangerousness and feared the victim as a result. (*Id*. at p. 165, see *People v. Minifie* (1996) 13 Cal.4th 1055, 1065 [" 'A person claiming self-defense is required to "prove his own frame of mind," and in so doing, is "entitled to corroborate his testimony that he was in fear for his life by proving the reasonableness of such fear" ' "].)

Second, if the victim's violent character was not known to the defendant, the victim's character for violence is nonetheless admissible to show that the victim was violently aggressive, causing the victim "to resort to deadly self-defense." (*People v.*

15.

*DelRio*, *supra*, 54 Cal.App.5th at p. 54.) Evidence of the victim's character for violence " 'tends to show that the victim was probably the aggressor.' " (*Id*. at p. 55.)

"The admission of such character evidence, however, is not without bounds." (*People v. Wright* (1985) 39 Cal.3d 576, 587.) Under Evidence Code section 352, the trial court maintains discretion to exclude relevant evidence " ' "if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." ' " Evidence Code section 352 guards against the admission of " ' "evidence which uniquely tends to evoke an emotional bias against defendant as an individual and which has very little effect on the issues." ' " (*People v. Rucker* (2005) 126 Cal.App.4th 1107, 1119.)

We review the trial court's evidentiary rulings for abuse of discretion. (*People v. Lewis* (2001) 26 Cal.4th 334, 374-375.) "Under the abuse of discretion standard, 'a trial court's ruling will not be disturbed, and reversal of the judgment is not required, unless the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.' " (*People v. Hovarter* (2008) 44 Cal.4th 983, 1004.)

### C.    *Analysis*

The trial court ruled that the probative value of the Evidence Code section 1103 evidence was substantially outweighed by the risk of misleading the jurors, confusing the issues, and undue prejudice (see Evid. Code, § 352). Insofar as the court concluded that there was an undue risk of confusing the jury on the issues, there were remedies available to the court. Namely, an admonition which would have explained the relevancy of the Evidence Code section 1103 evidence to the jury. Additionally, the trial court could have limited the admission of this evidence. (See *DelRio, supra*, 54 Cal.App.5th at p. 57 ["[w]hen a proffer contains some proof of high value mixed with other less vital material, it is traditional and proper under [Evidence Code] section 352 for a trial court to tailor the

16.

presentation in a discretionary way"].) Credibility issues aside, if the trial evidence was substantial enough to warrant instructing the jury on self-defense, at least some of the 1103 evidence should have been admitted.

We are persuaded however that any error in the trial court's exclusion of the Evidence Code section 1103 evidence was harmless. Because Gutierrez's constitutional rights were not implicated, we review the error under the standard articulated in *People v. Watson* (1956) 46 Cal.2d 818 (*Watson*). (See *People v. Marks* (2003) 31 Cal.4th 197, 227 ["[T]he application of ordinary rules of evidence like Evidence Code section 352 does not implicate the federal Constitution"].) Under *Watson*, we ask whether it is "reasonably probable that a result more favorable to defendant would have been reached in the absence of the error." (*Watson,* at p. 837.) We conclude that no such probability exists upon this record.

D.G. testified that Gutierrez had received a phone call from someone threatening to kill Gutierrez. Gutierrez also described prior occasions where he was followed, shot at, threatened, and physically attacked by Martinez and Martinez's associates. Thus, there was evidence supporting Gutierrez's claim that he feared Martinez and that Martinez was violent. But even assuming the jury did not find Gutierrez's testimony about Martinez credible, there was virtually no evidence to support the conclusion that Gutierrez had shot Martinez in self-defense, reasonable or otherwise.

There were no independent witnesses that supported the conclusion that Gutierrez was acting in self-defense. Nor did the physical evidence independently establish as much. (See, e.g., *DelRio, supra*, 54 Cal.App.5th at p. 57 [finding the exclusion of similar evidence prejudicial where an eyewitness to the murder "testified to classic self-defense," the defendant's version of events was compatible with the physical evidence, and he had no motive to shoot the victim].) Indeed, the physical evidence contradicted Gutierrez's version of events.

17.

Although Gutierrez claimed that he was afraid of Martinez and that their meeting at the traffic light was purely coincidental, the evidence demonstrated otherwise. The trial evidence supported the conclusion that Gutierrez had intentionally followed Martinez to the traffic light, which was a more secluded location than the gas station. He sat in his vehicle for several minutes before Martinez left the AMPM market, and then drove out after him. By his own admission, Gutierrez already had his revolver at the ready as he approached the stoplight. And, despite Gutierrez's claim that he was afraid of Martinez, he also remained stopped at the light to confront Martinez, rather than turning right to enter the freeway.

Gutierrez's claim that he and Martinez had argued at the traffic light was also inconsistent with the physical evidence. Martinez's window was rolled up when he was shot, and his music was playing loudly when he was discovered just minutes later. The trajectory of the bullet fired from Gutierrez's gun, which Gutierrez claimed had discharged accidentally, followed a straight path from 15 feet away. It struck Martinez on the right side of his head, and thus, he was facing forward when he was shot. This evidence strongly suggests that Martinez was an unsuspecting victim rather than the initial aggressor.

Based upon the foregoing, we find no reasonable probability that Gutierrez would have achieved a more favorable outcome at trial if the Evidence Code section 1103 evidence had been admitted. (*Watson*, *supra*, 46 Cal.2d at p. 837.) Gutierrez's assertion to the contrary is unpersuasive.

## II.     Gutierrez's Motions for a Mistrial

During trial, counsel moved for a mistrial on two relevant occasions. The first was after Derek LaFontaine, an investigator for the Madera County District Attorney's Office, testified that he had interacted, contacted, and arrested gang members who had used the phrase "listo," a term Gutierrez had also used to refer to himself. The implication from Investigator LaFontaine's testimony was that Gutierrez was gang affiliated. The second

relevant motion for mistrial occurred after the jurors were inadvertently allowed to view unredacted exhibits, including, booking sheets for Gutierrez and his acquaintance, Cevasco, as well as a letter Gutierrez had written to Cevasco (the Cevasco letter). Gutierrez contends that the trial court abused its discretion by declining to grant his motions. We disagree.

## A. *Standard of Review*

"In general, 'a motion for mistrial should be granted only when " 'a party's chances of receiving a fair trial have been irreparably damaged.' " ' " (*People v. Bell* (2019) 7 Cal.5th 70, 121.) " 'A trial court should declare a mistrial only " 'if the court is apprised of prejudice that it judges incurable by admonition or instruction.' " ' " (*Ibid*.; accord, *People v. Ramirez* (2022) 13 Cal.5th 997, 1126.)

" '[W]e use the deferential abuse of discretion standard to review a trial court['s] ruling denying a mistrial.' " (*People v. Clark* (2011) 52 Cal.4th 856, 990; accord, *People v. Ramirez, supra,* 13 Cal.5th at p. 1126.) "[T]he trial court possesses broad discretion to determine whether or not possible bias or prejudice against the defendant has contaminated the entire venire to such an extreme that its discharge is required." (*People v. Medina* (1990) 51 Cal.3d 870, 889.) We will find an abuse of discretion only where " ' "[the court's] ruling 'falls outside the bounds of reason' " ' " (*People v. Thomas* (2011) 52 Cal.4th 336, 354-355.)

## B. *Background*

### 1. The Trial Court's Order Prohibiting Any Reference to Gangs

Outside of the presence of the jury, the trial court asked the prosecutor whether he had spoken to Sergeant Benjamin Mendoza, a witness for the prosecution, to ensure that Sergeant Mendoza did not mention what drew his attention to the Cevasco letter. The prosecutor assured the court that he had spoken to Sergeant Mendoza and had instructed him not to "mention the Norteño and Sureño gang connection to the letter" and not to mention gangs during his testimony.

19.

Subsequently, Sergeant Nicolas Webster testified that during a search of Gutierrez's residence, he had recovered a Dodgers baseball cap and a "Forever Blue" handkerchief. Trial counsel reminded the court that the witnesses were prohibited from discussing or referencing gangs, and he made a motion for mistrial based upon Sergeant Webster's testimony. The court denied counsel's motion, finding that the challenged testimony did not have a significant connection to gangs.[3]

### 2. Investigator LaFontaine's Testimony

Investigator LaFontaine reviewed data extracted by the Department of Justice from Gutierrez's phone. During his testimony, the prosecutor asked LaFontaine about an email address associated with Gutierrez (gutierrezlisto9@gmail.com). The prosecutor asked LaFontaine whether he knew what "listo" meant. LaFontaine replied as follows: "While I was a patrol officer and a detective for the Madera Police Department, I particularly was assigned to and interacted, contacted, and arrested essentially gang members who use that same phrase 'listo.' "

Trial counsel interjected and the parties had an off the record discussion at the bench. The trial court went back on the record and the court admonished the jury as follows:

"[THE COURT]: We're back on the record.

"The objection is sustained and I'm…going to order that the witness's testimony regarding his experience as a …patrol officer be stricken.

"And, ladies and gentleman, you can't consider any portion of that answer for any purpose."

Later, outside of the presence of the jury, trial counsel moved for a mistrial. Counsel asserted that given the trial evidence showing that Gutierrez's nickname was "Listo," the jury could infer that Gutierrez was a gang member. The trial court denied

---

[3] Gutierrez does not challenge the trial court's denial of this motion on appeal.

counsel's motion, explaining that the jury had been instructed not to consider LaFontaine's testimony. The court admonished the prosecutor that the witnesses were prohibited from referring to Gutierrez's affiliation with criminal street gangs. The trial court added:

> "[THE COURT]: The…reference to the Dodger cap and the … 'True Blue,' or whatever it was, handkerchief, …I just don't find that to be suggestive of gang membership in any way, frankly.
>
> "I do understand, though, that as there are continued references, …that maybe a connection might be drawn by somebody, but … when the Court instructs the jury, there's a presumption that the jury follows the instruction.
>
> "In this instance, I ordered that the jurors not consider Officer LaFontaine's response to the question. It was actually nonresponsive…. I don't see from Mr. Petersen's question that he invited a reference to gang membership. The question was: 'How do you know what "Listo" means? ' and who knew that he was … going to go into a detail regarding his contacts with gang members?
>
> "I don't…believe that the answer suggests that all persons who use the name 'Listo' are gang members. I don't think it suggests that, but, in any event, they have been told to disregard it. Okay?"

During closing instructions, the trial court instructed the jury as follows: "If I ordered testimony stricken from the record, you must disregard it and must not consider that testimony for any purpose."

### 3. The Unredacted Cevasco Letter and Booking Sheets for Gutierrez and Cevasco

In his motion in limine, the prosecutor sought to admit evidence of Gutierrez's prior felony convictions for impeachment purposes. The trial court ruled that the following convictions were admissible: a 2006 conviction for carrying a concealed weapon, a 2006 conviction for vehicle theft, and a 2010 federal conviction for the

possession of a firearm or ammunition in interstate commerce. Gutierrez also had two convictions for vehicle theft occurring in 2007, and parole violations in 2015 and 2016.

Gutierrez's booking report, dated December 15, 2016 (the booking sheet), documented his criminal history, including his felony convictions. This document also included the following notation: "ALCOHOL, CLEAR WORK, GANG MEMBER, JAIL CASE." The booking sheet identified Gutierrez as being a member of the "SUREÑO" gang.

Cevasco's booking sheet, dated September 15, 2017, also included his criminal history, but there is no gang information documented in his report.

Regarding the Cevasco letter, the unredacted sections contain references to police discovering $370,000 in Gutierrez's vehicle, as well as accusations by Gutierrez's ex-girlfriend, accusing him of breaking windows on her vehicle and her home. The letter also states, "if any thang I'm happy that I gots busted floor this murder instead of all my other shit." The letter also discussed a plea deal Gutierrez had been offered. He explained, "at 25 years wit no life at 85% I'll only do 21 years which ain't nothing. The only thang I'm more worried about cuz knowing now I am is catching more time in prison or catching a 3 strike in there putting in work!!!"

During deliberations, the jury foreperson sent the court a note indicating that both the redacted and unredacted versions of the Cevasco letter had been provided to the jury. Juror Nos. 4, 5, and 12 represented that they had "scanned" the letter for keywords, but they had not discussed its contents. During deliberations, Juror No. 12 had offered to read the letter, but the jury foreperson suggested that they bring the issue to the attention of the judge. Jurors Nos. 5, 4, and 1 represented that the unredacted portions of the Cevasco letter were not discussed during deliberations.

The trial court asked the jurors whether they could follow an instruction to disregard the unredacted letter, and if they could continue to be fair, unbiased, and

impartial in evaluating the trial evidence. Jurors No. 4, 5, and 12 responded affirmatively.

Following the trial court's instruction to disregard the unredacted Cevasco letter, Juror No. 2 volunteered that the jury had also been provided with the "arrest records" for Cevasco and Gutierrez. Juror No. 2 provided these documents to the court. The court instructed the jurors not to discuss anything relating to those documents.

Outside of the presence of the jury, the trial court discussed the records, which were "[t]wo booking sheets that were used for the CDCR number." The booking sheets had been admitted pretrial and premarked for identification purposes but during trial, the prosecutor opted to rely upon witness testimony instead of the booking sheets.

Gutierrez's booking sheet detailed his criminal history, some of which the jury was already familiar with. However, it also stated: "ALCOHOL, CLEAR WORK, GANG MEMBER, JAIL CASE," and identified him as a member of the Sureños. Following a recess, the trial court questioned the jurors about the booking sheets.

Nearly all of the jurors represented that they had reviewed them, including, Juror Nos. 1, 2, 3, and 7 through 12. The trial court asked the jurors whether they could follow an instruction to proceed as if they had never read or seen the booking sheets. All of the jurors indicated that they could follow the court's instruction. The trial court asked the jurors whether any of those that had reviewed the booking sheets felt that they could not be fair, unbiased, and impartial in evaluating the evidence. All of the jurors indicated that they could be fair, unbiased, and impartial. The trial court ordered the jurors not to consider anything in the booking sheets during their deliberations, and to proceed as if they had never seen these documents.

Outside of the presence of the jury, trial counsel moved for a mistrial. Alternatively, counsel requested the court remove the jurors that had read the unredacted Cevasco letter. The prosecutor objected, observing that the booking sheets had been admitted into evidence without a request for redaction by trial counsel.

23.

The trial court denied Gutierrez's motion, finding that Gutierrez would not be denied a fair trial and that there had not been a due process violation. With respect to the unredacted Cevasco letter, the trial court stated that the jurors had indicated they had only scanned the letter and that nothing they had observed would cause bias or prejudice against Gutierrez. With respect to the booking sheets, the court observed that these documents had been received into evidence but the prosecutor had decided not to present them to the jury. All of the jurors that had reviewed the booking sheets had indicated they could continue to be fair and would follow the court's admonition to disregard the information in the booking sheets.

## C. Analysis

The trial court denied counsel's motion for a mistrial and ordered the jury to disregard the portion of LaFontaine's testimony regarding the word "listo," as well as the information in Gutierrez's and Cevasco's booking sheets. Generally, we presume that the jury can follow the trial court's instructions, and in the absence of affirmative evidence to the contrary, we presume the jurors have done so. (See *People v. Ortiz* (2012) 208 Cal.App.4th 1354, 1370.)

We conclude that the trial court did not abuse its discretion by concluding that the prejudicial effect of LaFontaine's testimony concerning the word "listo," the unredacted Cevasco letter, and Gutierrez's and Cevasco's booking sheets, was cured by admonition. Although we are mindful that awareness of Gutierrez's gang affiliation and involvement in other unspecified criminal activity inherently poses a risk of jury bias, this is not the " 'exceptional case' " where an admonition would be inadequate to cure any potential prejudice. (See *People v. McNally* (2015) 236 Cal.App.4th 1419, 1429.)

Even statements about a defendant's prior criminal conduct do not necessarily cause incurable prejudice requiring a mistrial. (See, e.g., *People v. Dalton* (2019) 7 Cal.5th 166, 240 [witness's comment the defendant "had molested [the witness's] children was not 'so incurably prejudicial that a new trial was required' "]; *People v.*

*Johnson* (2018) 6 Cal.5th 541, 581 [trial court did not abuse its discretion in denying a motion for a mistrial based on a witness's statement the defendant, on trial for committing a double murder, " 'had already beat two cases like this already' "]; *People v. Perez* (2018) 4 Cal.5th 421, 459 [trial court did not abuse its discretion in denying a motion for a mistrial based on a codefendant's statement that the defendant " 'just got out of the penitentiary' "]; *People v. Ledesma* (2006) 39 Cal.4th 641, 682-683 [witness's statement that the defendant had been on death row as a result of prior proceedings in the same case did not warrant a mistrial].) If statements about a defendant's prior criminality are not per se incurably prejudicial, statements about a defendant's gang affiliation or their potential involvement in uncharged criminal endeavors are not either.

" 'Juries often hear unsolicited and inadmissible comments and in order for trials to proceed without constant mistrial, it is axiomatic the prejudicial effect of these comments may be corrected by judicial admonishment; absent evidence to the contrary the error is deemed cured.' " (*People v. McNally, supra,* 236 Cal.App.4th at pp. 1428-1429, quoting *People v. Martin* (1983) 150 Cal.App.3d 148, 163; see e.g., *People v. Avila* (2006) 38 Cal.4th 491, 572-574 [any prejudice arising from witness's statement that defendant had " 'barely got[ten] out of prison' " at the time of the offense was cured by court's admonition " 'to disregard that testimony and treat it as though you had never heard it' " and " 'not discuss or consider it' " during deliberations]; *People v. Franklin* (2016) 248 Cal.App.4th 938, 956 [finding that "none of the three vague and fleeting references to appellant's criminal history resulted in incurable prejudice"].)

The record here lacks any affirmative indication that the jury was unable to disregard the testimony of Investigator LaFontaine concerning the word "listo," the unredacted Cevasco letter, and the booking sheets of Cevasco and Gutierrez. We therefore reject Gutierrez's claim that the trial court abused its discretion by denying his motions for a mistrial.

25.

In support of his claim that the errors here were incurably prejudicial however Gutierrez directs this court to *People v. Allen* (1978) 77 Cal.App.3d 924. There, the prosecutor called a witness in rebuttal to attack the credibility of another witness. The rebuttal witness disclosed that the defendant was on parole. (*Id.* at p. 934.) The trial court struck the witness's comment and admonished the jury to disregard it. On appeal, the court found that the defendant's motion for a mistrial should have been granted and that the witness's testimony was prejudicial under *Watson*. (*People v. Allen*, at p. 935.) The court reasoned that the case was very close, and that the credibility of the defendant was key. (*Ibid.*)

We do not find *People v. Allen* instructive here. As distinct from *People v. Allen*, the instant case was not particularly close. Though the jury did not find that Gutierrez had acted with premeditation and deliberation, there was substantial evidence that Gutierrez had acted with the intent to kill. Moreover, the fact that Gutierrez was acquitted of first degree murder, despite evidence showing that he had targeted Martinez, further demonstrates that the jury was not prejudiced against him.

Additionally, while the jury was presented with Gutierrez's booking sheet, which included his criminal history, the jury was already aware of the fact that he was a convicted felon. Even if the booking sheets and Investigator LaFontaine's testimony led the jury to further conclude that Gutierrez was gang affiliated, there was no evidence to suggest that the shooting was gang related, or that the jury convicted Gutierrez on this basis. We conclude that Gutierrez's assertion that he was prejudiced by the jury's exposure to the unredacted Cevasco letter and the booking sheets, as well as Investigator LaFontaine's fleeting testimony, is speculative upon this record.

**III. The Trial Court's Failure to Instruct the Jury on the Heat of Passion Theory of Voluntary Manslaughter**

Gutierrez further contends that the trial court erred by failing to instruct the jury sua sponte on voluntary manslaughter based on heat of passion, and that the error is prejudicial. We conclude that the instruction was not warranted.

### A. Standard of Review

The trial court has a "sua sponte [duty] to instruct fully on all lesser necessarily included offenses supported by the evidence." (*People v. Breverman* (1998) 19 Cal.4th 142, 148-149, disapproved on other grounds in *People v. Schuller* (2023) 15 Cal.5th 237, 255-260.) As relevant here, in a murder prosecution, if there is "substantial evidence to support a heat of passion theory of voluntary manslaughter, ... the ... trial court [must] instruct[ ] on this theory." (*Ibid.*; see also, *People v. Millbrook* (2014) 222 Cal.App.4th 1122, 1137.) However, " '[T]he existence of "*any* evidence, no matter how weak" will not justify instructions on a lesser included offense, but such instructions are required whenever evidence that the defendant is guilty only of the lesser offense is "substantial enough to merit consideration" by the jury.' " (*People v. Moye* (2009) 47 Cal.4th 537, 553; accord, *People v. Banks* (2023) 97 Cal.App.5th 376, 387.)

We independently review the question of whether the trial court erred by failing to instruct on a lesser included offense. (*People v. Nelson* (2016) 1 Cal.5th 513, 538.) In so doing, we view the evidence in the light most favorable to defendant and resolve in his favor any doubts about the sufficiency of the evidence to support the instruction. (*People v. Brothers* (2015) 236 Cal.App.4th 24, 30; *People v. Steskal* (2021) 11 Cal.5th 332, 345; *People v. Millbrook*, *supra*, 222 Cal.App.4th at p. 1137.)

### B. The Heat of Passion Theory of Involuntary Manslaughter

"An intentional, unlawful homicide is 'upon a sudden quarrel or heat of passion' (§ 192 [, subd.] (a)), and is thus voluntary manslaughter [citation], if the killer's reason was actually obscured as the result of a strong passion aroused by a 'provocation'

sufficient to cause an ' "ordinary [person] of average disposition ... to act rashly or without due deliberation and reflection, and from this passion rather than from judgment." ' [Citations.] ' "[N]o specific type of provocation [is] required ...." ' [Citations.] Moreover, the passion aroused need not be anger or rage, but can be any ' " '[v]iolent, intense, high-wrought or enthusiastic emotion' " ' [citations] other than revenge [citation]." (*People v. Breverman, supra,* 19 Cal.4th at p. 163.) The issue is not whether there was "such provocation that the ordinary person of average disposition would be moved to *kill*" but rather whether the provocation would cause an emotion so intense that an ordinary person in the same or similar circumstances "would simply *react*, without reflection." (*People v. Beltran* (2013) 56 Cal.4th 935, 949.)

"The heat of passion requirement for manslaughter has both an objective and a subjective component." (*People v. Steele* (2002) 27 Cal.4th 1230.) "To satisfy the subjective element of this form of voluntary manslaughter, the accused must be shown to have killed while under 'the actual influence of a strong passion' induced by such provocation." (*Moye, supra,* 47 Cal.4th at p. 550.) " ' "However, if sufficient time has elapsed between the provocation and the fatal blow for passion to subside and reason to return, the killing is not voluntary manslaughter...." ' " (*Ibid.*)

" ' "To satisfy the objective or 'reasonable person' element of this form of voluntary manslaughter, the accused's heat of passion must be due to 'sufficient provocation.' " ' " (*Moye, supra,* 47 Cal.4th at p. 549.) " 'The provocative conduct by the victim may be physical or verbal, but the conduct must be sufficiently provocative that it would cause an ordinary person of average disposition to act rashly or without due deliberation and reflection.' " (*Id.* at p. 550.) " 'As [the high court] explained long ago in interpreting the same language of section 192, "this heat of passion must be such a passion as would naturally be aroused in the mind of an ordinarily reasonable person under the given facts and circumstances," because "no defendant may set up his own standard of conduct and justify or excuse himself because in fact his passions were

aroused, unless further the jury believe that the facts and circumstances were sufficient to arouse the passions of the ordinarily reasonable man." ' " (*People v. Manriquez* (2005) 37 Cal.4th 547, 584.)

### C. Analysis

#### 1. Evidence that Gutierrez was Subjectively Provoked by Martinez's Conduct

We begin our analysis by acknowledging that Gutierrez's testimony was less than credible. Not only was his version of events not corroborated by any independent evidence, but the physical evidence also substantially contradicted his claims. For example, despite claiming that a heated confrontation had ensued at the stoplight, Martinez was shot through his rolled-up window on the right side of his head. His music was playing loudly when he was discovered, just minutes after he was shot. This evidence undercuts Gutierrez's claim that a verbal confrontation occurred at all.

Moreover, Gutierrez maintained that he discharged his revolver by accident, consistently denying having shot Martinez intentionally. A shooting out of "heat of passion" was therefore inconsistent with the defense's theory of the case.

However, neither the implausibility of Gutierrez's claims, nor their inconsistency with a heat of passion defense would necessarily obviate the need for an instruction on CALCRIM No. 570. (See *People v. Young* (2005) 34 Cal.4th 1149, 1200 [the trial court's determination of whether an instruction should be given must be made without reference to the credibility of the evidence]; *People v. Barton* (1995) 12 Cal.4th 186, 203 [" '[t]he jury should not be constrained by the fact that the prosecution and defense have chosen to focus on certain theories' "]; *People v. Madrigal* (2023) 93 Cal.App.5th 219, 243 [" 'The testimony of a single witness may be sufficient—even if there is significant countervailing evidence, and the testimony is subject to justifiable suspicion.' "].)

To that end, there was evidence that in the months preceding the shooting, Martinez had instigated a provocatory course of conduct against Gutierrez. A series of

29.

provocatory incidents occurring over a period of time may be sufficient to warrant an instruction on heat of passion manslaughter. (See *People v. Le* (2007) 158 Cal.App.4th 518, 528; accord, *People v. Wharton* (1991) 53 Cal.3d 522, 569; see e.g., *People v. Wright, supra,* 242 Cal.App.4th at p. 1483 [the victim's "repeated threats to take custody of their son away from [the] defendant, which came to a head the weekend when [the victim] returned him in a diaper without his regular clothing, provoked in [the defendant's] emotions of intense fear, anxiety, hopelessness, depression and anger that obscured [the victim's] reason"].)

Gutierrez described prior incidents wherein Martinez and his friends had threatened to kill Gutierrez, shot at him, and had beaten him with a baseball bat, causing two of his teeth to fall out. And, although no instigative final act is required under a heat of passion theory when the victim has engaged in a provocatory pattern of behavior against the defendant (see *People v. Wright, supra,* 242 Cal.App.4th at p. 1488), Gutierrez's testimony suggested that the stoplight confrontation marked a tipping point in the escalating hostility between the two men.

Nonetheless, even viewing the evidence in the light most favorable to Gutierrez, we are not persuaded that it was sufficient to demonstrate that he was subjectively provoked to the point that his judgment was impaired. Although Gutierrez despised Martinez and was fed up with him, Gutierrez did nothing when he encountered Martinez at the AMPM market just prior to the shooting.

Gutierrez further claimed that he was afraid of Martinez, and that he tried to avoid him at the AMPM. At one point, he became worried that Martinez was "trying to pull something out" of his vehicle. Yet, despite his stated fear of Martinez, Gutierrez drove out of the AMPM immediately after Martinez left, claiming that he had to get to work. This conduct is inconsistent with someone whose judgment is eclipsed by an intense emotion.

The final point Gutierrez could arguably have been subjectively provoked would have been the stoplight confrontation that immediately preceded the shooting. Gutierrez claimed that when he stopped next to Martinez, Martinez was yelling at him in Spanish and threatened Gutierrez to wait until his buddies show up. Gutierrez stated that he brandished his firearm to demonstrate to Martinez that he was not to be messed with, and he challenged Martinez to fight. We find two issues with Gutierrez's testimony as it relates to a heat of passion theory of voluntary manslaughter.

First, Gutierrez's version of events supports the conclusion that *he* instigated the stoplight confrontation. Although Gutierrez testified that he followed Martinez by coincidence, by his own admission, he pulled out his revolver as he approached Martinez's vehicle at the stoplight. And, instead of taking a right to the freeway, Gutierrez remained at the stoplight, brandishing a revolver in view of Martinez, arguably inciting any confrontation that may have occurred. (See *People v. Breverman, supra*, 19 Cal.4th at p. 163 [the victim, not the defendant, must have initiated the provocation that incited the killing]; see also, *People v. Oropeza* (2007) 151 Cal.App.4th 73, 83 ["[a] defendant may not provoke a fight, become the aggressor, and, without first seeking to withdraw from the conflict, kill an adversary and expect to reduce the crime to manslaughter by merely asserting that it was accomplished upon a sudden quarrel or in the heat of passion. The claim of provocation cannot be based on events for which the defendant is culpably responsible."]; and, *People v. Johnston* (2003) 113 Cal.App.4th 1299, 1312 [" 'If the defendant causes the victim to commit an act which the defendant could claim provoked him, he cannot kill the victim and claim that he was provoked. In such [a] case, he is deemed to have acted with malice and would be guilty of murder.' "].)

Second, Gutierrez did not testify, nor did the evidence independently establish, that he shot Martinez while acting under the influence of any intense emotion provoked by Martinez. To be clear, there was evidence that Gutierrez's passions were aroused. When trial counsel asked Gutierrez whether he was "responding calmly, or …did you

feel you were in control of your emotions at that point?" Martinez responded, "not exactly." Gutierrez also claimed that he was shaking during the confrontation. However, he explained that the shaking was both an emotional and physical response to the fact that he (Gutierrez) was holding a gun. He did not testify that his emotional and physical response was in response to Martinez's conduct, past or present.

We further observe that the confrontation at the stoplight, as described by Gutierrez, was no different than the prior interactions that Gutierrez had described with Martinez. Indeed, the stoplight confrontation was far less egregious than the prior instances Gutierrez described, including, being shot at while on the freeway. Gutierrez claimed that he never retaliated for these incidents, and that he even laughed at Martinez's first threat to kill him. However, he urges us to conclude that (1) he was consistently provoked by a pattern of conduct instigated by Martinez; and (2) that the stoplight confrontation "rekindled" his passion, resulting in Gutierrez acting not out of rational thought, but out of unconsidered reaction to Martinez's provocation. (*People v. Beltran*, *supra*, 56 Cal.4th at p. 942.) The record simply does not contain sufficient evidence to support these conclusions.

We acknowledge that the trial court gave the pinpoint instruction on provocation (CALCRIM No. 522 [Provocation: Effect on Degree of Murder]). CALCRIM No. 522 instructs the jury that if it concludes "the defendant committed murder but was provoked," "[to] consider the provocation in deciding whether the crime was first or second degree murder," and to "consider the provocation in deciding whether the defendant committed murder or manslaughter." CALCRIM No. 522 is a pinpoint instruction that must be given on request if there is evidence to support the theory. (See *People v. Thomas* (2023) 14 Cal.5th 327, 384.) Thus, the trial court found sufficient evidence of provocation to warrant the instruction.

We are not however persuaded that the trial court's decision to instruct the jury on CALCRIM No. 522 necessarily required it to also instruct the jury on a heat of passion

theory of voluntary manslaughter.  For heat of passion voluntary manslaughter, " ' "provocation *and* heat of passion must be affirmatively demonstrated." ' " (*People v. Steele*, *supra*, 27 Cal.4th at p. 1252.)  "The facts and circumstances must be ' "sufficient to arouse the passions of the ordinarily reasonable [person]." ' [Citation.]  Moreover, the defendant must 'actually be motivated by passion in committing the killing'; that is, he or she must be acting ' " 'under the smart of that sudden quarrel or heat of passion.' " ' " (*People v. Nelson, supra,* 1 Cal.5th at p. 539.)

The evidence here falls short of demonstrating that Gutierrez's judgment was actually obscured by an intense emotion, whether that be fear, anger, or some other high-wrought emotion.  We find two cases instructive.

In *People v. Dominguez,* the trial court refused the defendant's request for an instruction on heat of passion voluntary manslaughter.  (*People v. Dominguez* (2021) 66 Cal.App.5th 163 (*Dominguez*).)  There, the victim, a gang member, asked the defendants, " 'Where are you from?' " (*Id*. at pp. 173-174.)  An expert for the defense testified that when asked by a gang member to perceived rivals, this type of question almost certainly precedes violence.  (*Id*. at p. 177-178.)  Although the defendants were not gang members, they had previously experienced gang violence.  There was also evidence that the victim had lunged at the defendants while reaching for his waistband, an act which the defendants had perceived as the victim reaching for a weapon.  One of the victims testified that he was panicked and scared and he " 'just started shooting.' "  The defendants discharged a total of 21 bullets in less than four seconds.  (*Id*. at pp. 173-174.)  On appeal, the court found the trial court had reversibly erred by refusing a request by trial counsel to instruct the jury on voluntary manslaughter based upon heat of passion. (*Id*. at p. 185.)

In *Moye*, the defendant testified that he had killed with a baseball bat while acting in self-defense.  (*Moye*, *supra*, 47 Cal.4th at p. 546.)  He stated he was "not 'in the right state of mind,' " and that he was worried about getting beaten or killed by the victim.  (*Id*.

33.

at p. 552.)  The jury convicted him of second degree murder, rejecting the defendant's claim of perfect and imperfect self-defense.  (*Id.* at p. 540.)

On appeal, the defendant claimed that the jury should have instructed the jury on heat of passion voluntary manslaughter sua sponte.  (*Moye, supra*, 47 Cal.4th at p. 548.)  The appellate court found that there was insufficient evidence to support an instruction on heat of passion voluntary manslaughter because there was insufficient evidence that the defendant killed the victim while he was subjectively provoked.  (*Id.* at p. 554.)  Instead, the defendant described having acted *deliberately* in response to the victim's attack with a baseball bat, recounting each blow.  (*Id.* at pp. 554-555.)

The Attorney General contends that the instant case is more closely analogous to *Moye* than *Dominguez*.  We agree.  The trial evidence is inconsistent with Gutierrez was under the influence of a strong passion induced by provocation by Martinez.  Like the defendant in *Moye*, Gutierrez gave a detailed account of the events preceding the shooting, none of which suggested that he was acting under a violent or intense emotion that had obscured his reasoning, like the defendants in *Dominguez*.

### 2.  *The Objective Element: Evidence of Sufficient Provocation*

Even assuming the trial evidence was sufficient to establish the subject element of the heat of passion theory, we further conclude that there is insufficient evidence to support the objective component of heat of this theory.  With respect to the objective element of heat of passion, the defendant's heat of passion must be due to " ' " 'sufficient provocation.' " ' " (*Moye, supra*, 47 Cal.4th at p. 549.)  The provocation must be such as to cause an ordinary person of average disposition to act rashly or without due deliberation and reflection (*id.* at pp. 549-550) and from such passion rather than from judgment.  (*People v. Barton*, *supra*, 12 Cal.4th at p. 201.)  This is because " '[N]o defendant may set up his own standard of conduct and justify or excuse himself because in fact his passions were aroused, unless further the jury believes that the facts and

circumstances were sufficient to arouse the passions of the ordinarily reasonable [person].' " (*People v. Steele, supra*, 27 Cal.4th at pp. 1252-1253.)

Generally, " 'it is a question of fact for the jury whether the circumstances were sufficient to arouse the passions of the ordinarily reasonable person.' " (*People v. Millbrook, supra,* 222 Cal.App.4th at p. 1140.) "[A] court may decide the issue of adequate provocation [only] if 'the provocation is so slight ... that reasonable jurors could not differ on the issue of adequacy.' " (*Id*. at p. 1141.) That was the case here.

Gutierrez never offered a precise timeline establishing when each of the prior incidents perpetrated by Martinez had occurred. Consequently, the record lacks any affirmative indication that Gutierrez did not have a sufficient cooling off period between Martinez's prior attacks and the shooting. (See *Moye*, *supra*, 47 Cal.4th at p. 550 [" ' "if sufficient time has elapsed between the provocation and the fatal blow for passion to subside and reason to return, the killing is not voluntary manslaughter" ' "]; see e.g., *People v. McShane* (2019) 36 Cal.App.5th 245, 256 [finding that heat of passion instruction was not warranted where the murder occurred four days after the provocative conduct, and "[f]our days was sufficient 'cooling time,' as a matter of law"].)

Excluding evidence of the past incidents Gutierrez had recounted, neither Martinez's act of staring Gutierrez down at the AMPM market nor the confrontation at the stoplight were objectively adequate acts of provocation. Although Gutierrez claimed that he thought Martinez was reaching for a gun, he never claimed he saw Martinez actually brandish a weapon during the encounter. Gutierrez, in turn, displayed his revolver on the windowsill of his vehicle for approximately 10 seconds. That was ample time to determine whether Martinez was armed, which was the only objectively adequate act of provocation Gutierrez described. (See *People v. Manriquez*, *supra*, 37 Cal.4th at p. 586 [victim calling the defendant a " 'mother fucker' " and repeatedly taunting him to use a weapon if he had one was "plainly" insufficient provocation].) Based upon the

foregoing, we conclude that there was insufficient evidence to establish the objective element of the heat of passion theory of voluntary manslaughter.[4]

## IV.    The Trial Court's Failure to Strike the Firearm Enhancements

In his final claim on appeal, Gutierrez submits that the trial court erred in failing to dismiss the firearm enhancements applied to his murder conviction. According to Gutierrez, subdivision (c)(2) of section 1385 creates a rebuttable presumption in favor of dismissal where multiple enhancements are alleged in any single case, and where the overall sentence is over 20 years, unless the trial court finds that dismissal would endanger the public safety. The Attorney General contends that Gutierrez has forfeited his claim, and that Gutierrez's claim lacks merit. We conclude that Gutierrez has forfeited his argument by failing to raise the issue below. With respect to Gutierrez's alternative claim of ineffective assistance of counsel, we conclude that he has failed to demonstrate prejudice.[5]

### A.  Background

On July 8, 2022, the trial court sentenced Gutierrez. At the sentencing hearing, the court discussed the presence of mitigating and aggravating factors. In so doing, the trial court found unpersuasive some of the mitigating factors cited in Gutierrez's sentencing brief.

With respect to the shooting, the court observed that the evidence adduced at trial did not demonstrate that Martinez was the initial aggressor. Rather, the physical

---

[4] Gutierrez further contends that the cumulative effect of the errors identified necessitates reversal of his conviction. We conclude that neither the errors, considered individually or collectively, support reversal.

[5] In light of our conclusions, we do not address the Attorney General's contention that one of the mitigating factors cited by Gutierrez is inapplicable based upon the fact that Gutierrez's sentence for second degree murder renders his sentence longer than 20 years, notwithstanding the application of the firearm use enhancement. (See § 1385, subd. (c)(2)(C).)

evidence was consistent with Gutierrez having pursued and then shot Martinez while Martinez waited at the stoplight.  The court further found that the evidence did not show that Gutierrez was at imminent risk of great bodily injury or death when he shot and killed Martinez.  As the trial court observed, the physical evidence demonstrated that Martinez's window was rolled up at the time of the shooting and Martinez's music was playing loudly.  These circumstances were inconsistent with an argument having preceded the shooting.  Yet, Gutierrez never admitted wrongdoing, claiming instead that he had acted in self-defense.

The trial court further observed that Gutierrez had suffered seven felony convictions and six misdemeanor convictions.  The court imposed concurrent sentences on counts 2 and 3, because the crimes had occurred simultaneously, and imposed the section 12022.53, subdivision (d) firearm use enhancement.  The court imposed but stayed the remainder of the firearm enhancements.

### B.  Standard of Review

The trial court denied Gutierrez's request to strike the firearm in the furtherance of justice pursuant to sections 1385 and 12022.53, subdivision (h).  We review its decision for abuse of discretion.  (*People v. Carmony* (2004) 33 Cal.4th 367, 374.)

"In reviewing for abuse of discretion, we are guided by two fundamental precepts.  First, ' "[t]he burden is on the party attacking the sentence to clearly show that the sentencing decision was irrational or arbitrary.  [Citation.]  In the absence of such a showing, the trial court is presumed to have acted to achieve legitimate sentencing objectives, and its discretionary determination to impose a particular sentence will not be set aside on review." '  [Citations.]  Second, a ' "decision will not be reversed merely because reasonable people might disagree.  'An appellate tribunal is neither authorized nor warranted in substituting its judgment for the judgment of the trial judge." '  [Citations.]  Taken together, these precepts establish that a trial court does not abuse its

discretion unless its decision is so irrational or arbitrary that no reasonable person could agree with it." (*People v. Carmony, supra*, 33 Cal.4th at pp. 376-377.)

### C. Senate Bill No. 81

Effective January 1, 2022, Senate Bill No. 81 (2021-2022 Reg. Sess.) amended section 1385 to guide trial courts in deciding whether and when to dismiss sentencing enhancements. (Stats. 2021, ch. 721, § 1.) As amended, section 1385 grants trial courts the authority and a simultaneous duty "to strike or dismiss a[ sentencing] enhancement" (or, if they prefer, the "additional punishment for that enhancement" if doing so is "in the furtherance of justice"). (§ 1385, subds. (b) & (c)(1).) Although this provision makes clear that whether dismissal of an enhancement is "in the furtherance of justice" is a "discretion[ary]" call for the trial court to make (*id.*, subds. (c)(1), (c)(2), (c)(3)), the provision also directs that the existence of any of nine enumerated "mitigating circumstances" "weighs greatly in favor of dismissing the enhancement, unless the court finds that dismissal of the enhancement would endanger public safety." (*Id.*, subd. (c)(2).)

In *People v. Walker* (2024) 16 Cal.5th 1024 (*Walker*), our Supreme Court considered whether subdivision (c)(2) of section 1385 requires courts to consider whether the dismissal of an enhancement is in the interests of justice to afford great weight to the presence of certain mitigating factors enumerated under the statute. The court held that the statute did not create a presumption in favor of dismissing a sentencing enhancement when such factors are proven. (*Id.* at p. 1029.) Instead, "absent a finding that dismissal would endanger public safety, a court retains the discretion to impose or dismiss enhancements provided that it assigns significant value to the enumerated mitigating circumstances when they are present." (*Ibid.*) "In other words, if the court does not find that dismissal would endanger public safety, the presence of an enumerated mitigating circumstance will generally result in the dismissal of an enhancement unless the sentencing court finds substantial, credible evidence of countervailing factors that 'may

38.

nonetheless neutralize even the great weight of the mitigating circumstance, such that dismissal of the enhancement is not in furtherance of justice.' "  (*Ibid.*)

Our Supreme Court did not however address whether the "shall be dismissed" language in subdivision (c)(2)(B) "entitles that mitigating circumstance to a different construction than the others."  (*People v. Walker, supra*, 16 Cal.5th at p. 1035, fn. 5.) This language also appears in subdivision (c)(2)(C) of section 1385.

### D. Analysis

Gutierrez contends that two mitigating factors were present here, and that the presence of these factors necessitated dismissal of the firearm use enhancements.  First, that "[t]he application of an enhancement could result in a sentence of over 20 years." (§ 1385, subd. (c)(2)(C).)  Second, that "[m]ultiple enhancements [were] alleged in a single case."  (*Id*. subd. (c)(2)(B).)  It is undisputed that Gutierrez failed to raise this issue at his sentencing hearing.  Gutierrez specifically concedes that while trial counsel asked the court to impose a mitigated sentence, he never specifically asked the court to strike the firearm enhancements.  We therefore conclude that he has forfeited his claim on appeal.

"Under section 1385, a defendant 'ha[s] the right to "invite the court to exercise its power by an application to strike a count or allegation of an accusatory pleading" ....' [Citation.]  However, 'any failure on the part of a defendant to invite the court to dismiss under section 1385 ... waives or forfeits his right to raise the issue on appeal.'  [Citation.] Defendant's claim is forfeited for failure to request that the trial court strike the enhancements under section 1385."  (*People v. Coleman* (2024) 98 Cal.App.5th 709, 724.)  "A party cannot argue [on appeal that the trial] court erred in failing to conduct an analysis it was not asked to conduct."  (*People v. Partida* (2005) 37 Cal.4th 428, 435.)  In light of our conclusion that Gutierrez forfeited his claim, we now turn to his alternative assertion that his trial counsel was constitutionally ineffective for failing to raise this issue below.

To prevail on a claim of ineffective assistance of counsel, an appellant is required to make a two-part showing. (See *People v. Pope* (1979) 23 Cal.3d 412, 425 [a defendant has the burden of proving ineffective assistance of counsel], overruled on another ground in *People v. Berryman* (1993) 6 Cal.4th 1048, fn. 10.) First, they must establish that "counsel's representation fell below an objective standard of reasonableness under prevailing professional norms." (*People v. Kelly* (1992) 1 Cal.4th 495, 519-520.) Second, they must show that trial counsel's deficient performance was prejudicial. (*Ibid.*) Prejudice must be affirmatively shown; the record must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Strickland v. Washington* (1984) 466 U.S. 668, 694.)

In interpreting the " 'shall be dismissed' " language of subdivision (c)(2)(B) and (c)(2)(C) of amended section 1385, California appellate courts have unanimously rejected the same argument raised by Gutierrez here. (See *People v. Mendoza* (2023) 88 Cal.App.5th 287, 294-297 [rejecting appellant's assertion that under section 1385, subd. (c)(2)(C), dismissal is required where an enhancement would result in a prison sentence of over 20 years]; *People v. Mazur* (2023) 97 Cal.App.5th 438, 445 ["even when a [section 1385,] subdivision (c)(2)(B) or (C) mitigating circumstance applies, the statute only requires the court to give it 'great weight' in making a discretionary determination whether dismissal is in furtherance of justice"], review granted Feb. 14, 2024, S283229; *People v. Anderson* (2023) 88 Cal.App.5th 233, 240 ["dismissal *shall* occur but only *if*, in exercising its discretion and giving great weight to certain factors, the court finds dismissal is in the interests of justice or would not endanger public safety"], review granted Apr. 19, 2023, S278786; *People v. Renteria* (2023) 96 Cal.App.5th 1276, 1289-1290 [mitigating circumstances in subdivision 1385, subdivisions (c)(2)(B) and (C) "do not require dismissal of enhancements where dismissal would endanger public safety"];

*People v. Lipscomb* (2022) 87 Cal.App.5th 9, 15-21 [same]; *People v. Walker* (2022) 86 Cal.App.5th 386, 396-398, review granted Mar. 22, 2023, S278309 [explaining that if the court were to interpret subdivision (c)(2)(B) and (C) as mandatory, then the existence of the mitigating factors therein "would not 'weigh greatly' in favor of dismissal—it would weigh *dispositively*"].)  In sum, subdivision (c)(2)(B) and (C) of section 1385 do not mandate dismissal of the firearm use enhancements, and the trial court did not err by failing to do so here.

Gutierrez further observes that the trial court did not make an explicit finding that dismissal of the firearm use enhancements would endanger the public safety.  According to Gutierrez, this alone constituted an abuse of discretion.  Once again, his failure to raise these issues at the sentencing hearing below resulted in forfeiture of his claim on appeal.

Forfeiture aside, the record does not support Gutierrez's claim that he was prejudiced by trial counsel's failure to raise these issues.  (See *Strickland v. Washington*, *supra*, 466 U.S. at p. 694 [prejudice must be affirmatively shown; the record must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different"].)  Based upon the trial court's findings at Gutierrez's sentencing hearing, there is no reasonable likelihood that the court would have stricken the firearm enhancements applied to Gutierrez's sentence.

Gutierrez further complains that the trial court made findings at sentencing that were inconsistent with the jury's verdict.  At sentencing, the trial court found that the evidence showing Martinez had provoked the attack was not persuasive, and it was contrary to the physical evidence.  According to Gutierrez, the jury's verdict, finding Gutierrez guilty of second degree murder, demonstrates that it necessarily found Martinez had provoked Gutierrez.

By convicting Gutierrez of second degree murder, the jury may in fact have found sufficient evidence that Gutierrez had been provoked by Martinez.  Alternatively, the jury may have concluded that while Gutierrez was not provoked, there was nonetheless

insufficient evidence that he killed Martinez with premeditation and deliberation.  The jury's verdict may also have been the result of compromise.  Because we do not know what the jury based its verdict upon, the trial court's conclusions were not necessarily inconsistent with the jury's findings.  Gutierrez's assertion to the contrary is unpersuasive, and his claim of prejudicial error fails as a result.

## **DISPOSITION**

The judgment of conviction is affirmed.

SMITH, J.

WE CONCUR:

DETJEN, Acting P. J.

SNAUFFER, J.